This should probably be Ann Lopez, I assume, with the change in the next case. Yes. Okay. And we'll hear first from Mr. Beck. You may proceed. Good morning, Your Honors. My name is Alan Beck, and the matter before this Court is the constitutionality of Hawaii's ban on butterfly knives. I will endeavor to make three points during this argument. One, butterfly knives as are all knives, protected arms. Two, there is no historical basis for banning butterfly knives. And three, that the historical analogies are inappropriate in this circumstance. The analogies that the state has provided are inapposite. Heller finds that the Second Amendment applies prima facie to all bearable arms. Here, we've established that butterfly knives are an arm, and the state has made no effort to rebut that. And the record has demonstrated that butterfly knives are typically used for martial arts and self-defense purposes throughout the United States. They're legal in 48 states, and there's been no evidence presented that they're not used for self-defense. Does the record show how many are in private hands? The record does not demonstrate that. However, the amicus brief of the Knife Rights Institute did indicate that just in a five-year period, I think it was like 1985, for about five years, five years in the 1980s, that several hundred thousand were sold, just in that five-year period, Your Honor. In Heller, the Supreme Court said dangerous and unusual weapons are not covered under the Second Amendment. I think the court gave an example of sawed-off shotguns, and presumably it doesn't cover things like RPGs or bazookas because they're dangerous and unusual weapons not used for self-defense. With Bruin, how do we analyze that? Is that just a freestanding inquiry, threshold inquiry, or is that kind of subsumed under the historical analogs? How do we kind of square those two principles in Bruin and Heller? I have a couple of points to make. I actually dispute the fact that the dangerous-unusual language is – in Heller, the court is referencing the carrying of dangerous-unusual weapons. So, I think a proper historical inquiry would actually demonstrate that, refer to time, place, and manner restrictions. And that's something I'll preserve for further review. But based upon this court's precedent and Justice Alito's precedent in Satano, we believe that, one, this is a conjunctive phrase. They have to be dangerous and unusual, and it should be subsumed into the basic inquiry of typically possessed for lawful purposes. Because if something is – under the modern analysis of that phrase, if something is typically possessed for lawful purposes, by definition, it cannot be unusual for lawful purposes, Your Honor. So, it's subsumed in the historical analog? And for the historical analog, I mean, is it possible to have a weapon that is considered dangerous and unusual, but there isn't a law, say, in the founding era that banned it? I mean, is there some narrow area where a law could – where a weapon could be considered dangerous and unusual, but there wasn't necessarily banned? I mean, perhaps it wasn't easily accessible. Sure. I mean, if its use is typically not for a lawful purpose, especially if it's something that didn't exist at – I mean, it's the same basic inquiry. You know, do you look at – I note that I believe it was Justice Kavanaugh said as concurrence, Your Honor, is that we have not changed the analysis from Heller as to what is protected by the Second Amendment. So, that basic inquiry stays the same. And I think if something is typically not used for a lawful purpose, then yes, it can be considered unusual regardless of whether it was a – whether it was a complete ban at the time of the founding. I would note, though, that our supplemental brief indicates that balisong knives or butterfly knives were – existed in the Americas at the time of the ratification. They were made in France and imported here. That's on page five of my supplemental brief. And there were no bans on any type of knife at 1791, certainly not on balisong knives. So, our position is that there should not be a illogical inquiry. This is something that existed at the time of the founding. Therefore, what this Court should do is find whether there is a direct – a direct law on point from 1791. If there's not, we believe the inquiry ends there. So, is it your position that every bladed instrument is presumptively entitled to Second Amendment protection, or what is the category as you would define it? Well, no, Your Honor. First, a weapon has to be bearable on the person. So, something that isn't designed to be used by a single person is obviously not going to be inside the inquiry. Two, it has to be something that is typically possessed for a lawful purpose. That – and in this case, you know, so something that maybe is not designed for – at all for self-defense, and the government could rebut the presumption that there is something that is protected by demonstrate, and this simply is not something that has a self-defense purpose, then it could be possible for the government to rebut that. But here, that's simply not the case. The record indicates that the legislative testimony that came before this – when they were in the process of banning it, there was legislative testimony both from the Public that demonstrate that the balisong knife is a weapon that's typically used for self-defense. Additionally, our expert in the trial court spoke considerably on the balisong knife use as a self-defense tool and as a utility tool. So, in this instance, we absolutely – there's absolutely a prima facie case. There's Second Amendment protection in this instance, Your Honor. Now, the – and furthermore to that, the State of Hawaii, again, it was under Buren, they are – it's their obligation to affirmatively demonstrate historical tradition of this issue, and I – we have not been able to – they were unable to demonstrate any knife bans in 1791. And additionally, they – the only thing they were able to decide to were bans on bowie knives that all began around the 1830s. However, these were bans on the concealed carry primarily of bowie knives. Therefore, we don't believe that – one, that it needs to be relied upon at all, because butterfly knives existed at 1791. And two, even if the court could rely upon that, since we're dealing with a ban on possession here, and laws the state has relied upon only ban on the manner of carry, that this is – those are not relevantly similar, even as court would look to – would engage in analogical reasoning. So for that reason, I mean, the – this is a reasonably – this is a complete ban, and we don't have any – I think Buren is pretty clear here on – once you've established something's protected, you simply can't completely ban it. And I'd like to open up to any questions if – So if we had – so is it bowie or bowie knife? I believe it's bowie. Bowie? Okay. Yeah. If we had a total ban on carriage of a bowie knife, would that be a violation of the Second Amendment under your theory? Yes. I believe that would be, Your Honor. And why wouldn't the historical tradition on, as you said, of carriage restrictions be a counter to that argument? Because you have to look to how and why these laws were in place. And these laws – that's from the Buren opinion, and these cases were not made to cut off your right to self-defense completely. What these concealed carry bans were designed for – this was a society that discussed – that believed concealed carry was typically for a nefarious purpose. I mean, I'd point to the Pruitt decision speaks very eloquently on this. And because all that was being done is they were cutting off a manner they did not believe had a self-defense purpose. It typically wasn't – you typically open carried for – when you were engaged in self-defense at the time, and you had a mechanism for self-defense. Therefore, it's – those laws are not relevantly similar, Your Honor, to a complete ban on open carry – I mean, sorry, a complete ban on bowie knives. Sorry. Is there anything in the record on how often butterfly knives are used for defensive purposes? There are not – there's not actual numbers on it, Your Honor. I mean, our expert does have a couple of anecdotal instances in his expert report, but in terms of actual statistical data, I just don't believe that exists, Your Honor. I may – if the court doesn't have any additional questions, I mean, I may save the rest of my time for rebuttal. I mean, ultimately our position is since these arms are used for – the record indicates these are self-defense arms, their presumption. The state of Hawaii simply can't ban these arms, you know, completely within the home, and Heller supports that position. If this court doesn't have any more questions, I'm going to save the rest of my time for rebuttal. All right. Then we'll hear from – Thank you. Thank you. And we'll hear from Mr. Nakatsugi. Did I pronounce that correctly? Yes, Your Honor. Okay. All right. You may proceed. Good morning, Your Honors. My name is Robert Nakatsugi. I'm the first Deputy Solicitor General for the State of Hawaii, and I represent the defendants' appellees, the Attorney General and the Sheriff Division Administrator for Hawaii. Am I correct that the Attorney General is now Anne Lopez, and that should be changed in our caption? Yes, Your Honor. Anne Lopez is now the Attorney General, and I will correct that electronically when I get out of court. May it please the court. Your Honor, initially I'd like to mention a preliminary matter. At this time, I'd like to renew our request to remand this case to the district court. The motions panel denied our initial request and ordered supplemental briefing, but this court has now had an opportunity to review the supplemental briefs, and I think the supplemental briefs indicate how complex the historical analysis is. And really, the supplemental briefs really touch the tip of the iceberg here. I think the analysis could be much, much further. We were limited to 10,000 words and had to file it in 30 days. But if the court remands to district court, I think there would be a much greater opportunity to flesh out the record, particularly the historical analysis, as well as addressing the Bruin issues. Bruin has raised a number of new issues, including footnote 9 of Bruin. Pardon me, counsel. I'm having trouble following you. What facts, as opposed to legal research into other laws, do you propose could be developed by a remand? Well, Your Honor, I think the historical facts, I think, could be addressed. Historical facts, Your Honor. I think we could obtain analyses from expert witnesses. But historical facts are part of the legal analysis under Bruin, and those were available to you before. Well, Your Honor, we did the best that we could. So are you arguing that you'd like to have a second chance to do a little bit more research? Well, Your Honor, these historical issues are extremely complex, and the vast majority of Second Amendment cases have, in fact, remanded these cases to the district courts. Expert witnesses testify. I think the record is fleshed out a lot better. And if this court would like to have a much— But witnesses testifying as to facts or as to law? As to the historical analysis, Your Honor. The historical analysis under Bruin is as to historical analogs in the law which limited the use of arms, right? Yes, Your Honor, and we— Why weren't those available to you before? Well, Your Honor, Bruin has provided guidance that did not exist before. It said look at the history, right? But maybe you can tell me what impediments there were to you doing the research as to historical analogs in the law which prohibited the use of butterfly knives that you now have overcome so that you can go back and do some further historical research. That's what I'm having trouble with. Well, Your Honor, Bruin has provided more guidance, and I think— Bruin has provided more guidance and also some concepts that did not exist previously. For example, Bruin talks a lot about the focus on law-abiding responsible citizens, and I think that's a key concept here because this statute is focused on prohibiting a weapon that is popular among criminals and not law-abiding responsible citizens. Your Honor, if the court is not willing to remand, we do have argument on the merits. Go ahead. And if I could proceed, Your Honor, our position is that the butterfly knife statute in this case is directed toward prohibiting a weapon that's associated with criminals and criminal activity. What weapons are not associated with criminal activity? Well, Your Honor, there are weapons that are useful in self-defense, handguns, for instance. They're the quintessential self-defense weapon. This weapon, however, is associated with criminals. This weapon is one like the slung shots and bowing knives. There are weapons that are effective for self-defense that are not effective for criminal activity. Is that right? Well, Your Honor, there are weapons that have become associated with criminals. There are weapons that ordinary law-abiding citizens do not use, and they're popular among criminals, and states have banned them for a very long time. Does that have to do with knives? Yes, Your Honor. There is a statute that King Kamehameha III in Hawaii passed in 1833. It was directed against knives and sword canes, and the decree specifically said sailors were coming ashore to commit crimes. And from there, there were numerous other statutes that Hawaii passed in 1852 and 1937, and it's also similar to the laws that were passed in the continental United States at about the same time period. This is sort of a basic question. Do you agree that some knives, some bladed instruments qualify as arms for purposes of the Second Amendment? Your Honor, I think knives in general can qualify as arms. The problem here is that these are butterfly knives. So it's just whether or not there's a particular category. So does that mean that the doctrinal box that they fit in is dangerous and unusual? Well, Your Honor, the dangerous and unusual weapons exception I think is related to what we're dealing with here. The dangerous and unusual weapons exception, I think it focuses on weapons that are unusually dangerous, meaning they're like machine guns or sawed-off shotguns. They're more dangerous than an ordinary weapon. So the weapon that we're dealing with here also is one that's popular among criminals. And so I think there are two concepts that are— The Supreme Court has given us two sort of boxes here. One is it's the type of arm that is commonly used by law-abiding citizens. So there's a qualifier there. So you might have a bladed instrument that's not of a kind that's commonly used by ordinary citizens. And then there's a second box of dangerous and unusual that's sort of a further carve-out. Which of the—used a lot by criminals isn't one of the categories they've given us. And handguns are used a lot by criminals. So that isn't getting us anywhere. I don't understand which doctrinal box that the Supreme Court has given us you're telling us this falls into. Well, Your Honor, it does fall in the dangerous and unusual weapons box. We argued that in our original answering brief. But what's the evidence that butterfly knives aren't used for self-defense? Well, Your Honor, the legislative history in this case concluded that it's a weapon that's used among criminals. But, I mean, look, the Glock is probably the most popular handgun in America. But it's also in popular culture associated with criminal activity. You can watch movies or songs where people talk about criminal activities with a Glock. Under your test, then, that would be a dangerous and unusual weapon even though it's the most popular handgun in America. I mean, is there any evidence that butterfly knives are used primarily for criminal activity other than just saying what it is? Well, the evidence is in the legislative history, Your Honor. It was very extensive. Prosecutors and police officers testified to the legislature. And the legislature concluded that it was associated with criminals. There was some competing testimony. There was a testimony from a practitioner of a martial art called Eskrima. But that's a single martial art. This martial art is not recognized by the Olympic Games. And the legislature rejected that testimony and instead concluded that it was associated with criminals. So the legislative history is there. And Mr. Beck, I think, admitted that there is no other evidence that this is a weapon that's commonly used for self-defense. So the evidence to the contrary is not there. The legislative history is there. And the history of other weapons, too, supports this. You know, this is not something new. This is something that has gone back to the early 1800s. Bowie knives, slung shots, billy clubs, brass knuckles. There's a whole category of weapons that is deemed to be the arsenal of the criminal. That's what the cases say. And so these weapons were banned. Historically, they were banned. And so this satisfies, I believe, the Bruin analysis, which is you look for historical analog. Well, I mean, it's not accurate to say there's a history of banning similar weapons. I mean, most of them were more narrow. Maybe they said no concealed carry or public carry or maybe selling of it. But there were very few laws that had a complete ban. And I think even pre-Bruin, our circuit has made that distinction. Complete ban versus grandfathered versus public carry, concealed carry. So it's not accurate to say there was a historical analog. Even if you assume it's a historical analog, there was a complete ban on Bowie knives and slung shots. Your Honor, I can address that. Take a look at the addendum attached to my supplemental brief. The laws are there. I've included copies of all the laws. And what you'll see is that there are certain weapons where there is a complete ban and not only that. There are a few exceptions, but most of them aren't, and most of them are more narrow. They say you can't carry in public, you can't sell them. But here the Hawaii's law is a complete ban. There's not even a grandfather clause. You can't keep it at your home. I mean it's much more far-reaching, and we've recognized this, again, pre-Bruin, that that is very far-reaching. Your Honor, I'd ask you again to look at those laws that I've attached to my addendum because they do have very broad bans. They restrict them in all kinds of ways. Some of them ban manufacture and sale. Some of them ban open carry. Some of them ban concealed carry. Some of them ban carrying them in a rude and threatening manner. How many laws are a complete ban like Hawaii that you can't possess them at your home? Nothing? Complete ban? Most of the laws that ban some of the kind of exotic weapons do that, like slung shots. How many laws do that? Your Honor, I didn't count them, but they're all there in my addendum. I think most of them do have very broad restrictions like that. I think the problem that we're having here is that some of these laws also include other things like handguns. Under Bruin, a handgun really has to have some form of open carry or public carry. But I think that the problem is that they're lumping these laws together. Often these laws are lumped together. But I think if you look at the laws that really address the laws that we're talking about here, the laws that are associated with criminals, you'll see that they're very broad bans. I think there's a fundamental difference between a weapon like a handgun, which ordinary people do need to have access to. It makes sense to have some form of public carry if ordinary people are going to be using them. But if you're talking about a weapon that's very closely associated with criminals and criminal activity, the idea is to get the arsenal out of the hands of the criminal. So that's why you need a more restrictive ban on these kinds of weapons. And butterfly knives fall into that second category, Your Honor. These are weapons that are associated with criminals. And so allowing them to be open carried but not concealed carried is not going to solve the problem. The criminals are going to kill you in another way. These are weapons that are associated with criminals, and so the restrictions are, in fact, very severe. But it should be allowed because, again, we have this historical tradition that goes back very, very far to the early 1800s. Mr. Beck argues that butterfly knives come from medieval France. I don't think this is a medieval weapon. I think this is a weapon that probably came from the Philippines. The competing evidence from their own witnesses indicates that there is another story, that this weapon could have come from the Philippines. I think that's more likely, and it became a social problem in Hawaii in the 1990s. Let me go back to the doctrinal question again. Do you see a difference between the Supreme Court's statement that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes? Do you see a difference between that standard and this standard you're talking about, about associated with criminals? Are those two ways of saying the same thing? I think they're the same thing, Your Honor. We're talking about a weapon that is associated with criminals, not lawful purposes, not law-abiding responsible citizens. Mr. Beck says that there's hundreds of thousands of these knives already in the United States and that 48 states permit them. Why doesn't that establish that they are typically possessed by law-abiding citizens for lawful purposes? I'm not seeing the reports of the crime waves of butterfly knives in the other 48 states. Your Honor, I think it really depends on whether the knife becomes a problem in a particular location. Butterfly knives are banned in California and New Mexico. They're treated as switchblades. There are other restrictions in Oregon. There may be restrictions in New Jersey and I think Washington, although that's not entirely clear. But there are other states that ban butterfly knives, sometimes as part of the switchblade definition. But there are states where it has become a problem. Hawaii was one of those states where butterfly knives became a problem. And because of that, they became part of the tradition of banning weapons associated with criminals. They may not have become a social problem in other states. It really depends, I think, on the state. But the evidence is clear that it did become a problem in Hawaii. And that was why our legislature banned them. The evidence is the set of letters that are in the legislative history. Is there more to that legislative history than those? Was there an actual hearing with testimony? Your Honor, that was the testimony that was submitted. I think that is the extent of the legislative history that we have. But, you know, it is, I think, somewhat conclusory. It doesn't have, like, statistics or any kind of... Well, Your Honor, this was testimony from police officers and prosecutors who were saying that the problem existed. So I don't know, I mean, I don't think there would be any statistics at that time. I think it's these officers who are in the line telling you what they're experiencing, which is these weapons were showing up and youth gangs were getting a hold of them. And so they were becoming a problem. They were associated with these youth gangs. And that was the reason why they were banned. There's actually a long history of Hawaii trying to deal with this problem. It started with applying the switchblade law. The Hawaii Supreme Court said that the switchblade statute didn't stretch that far. So the legislature added butterfly knives to Hawaii's deadly weapons statute. Ultimately, Hawaii put it in a separate statute to emphasize how important it was, also to emphasize its similarity to switchblades. Switchblades, too, have a long history of being used for criminal activity. The federal legislative history of the Federal Switchblade Act demonstrates that. So, again, it's part of that long tradition of prohibiting weapons associated with criminal activity. Now, Your Honor, yes, sir. You mentioned switchblades. Is there something I might have missed in the record showing switchblades or pocketknives, which have a spring action, being limited in colonial times or in 1868? Well, Your Honor, I don't think switchblades are specifically addressed going that far. But other weapons that have become popular among criminals are addressed. I'm not talking about other weapons. Please direct your answer to me to switchblades and pocketknives with spring action. I am not aware of switchblade laws banning that far back. Now, again, Your Honor, in addition to the Bruin historical analysis, I'd also like to call your attention to footnote 9 of Bruin, because footnote 9 of Bruin addresses regulations that are designed to ensure that the persons in the jurisdiction carrying weapons are, in fact, law-abiding responsible citizens. I mean, I'd see footnote 9 in the next case, but this one is a total ban so it doesn't look like a footnote 9 case. I can understand your opinion on that, Your Honor, but footnote 9 does focus on law-abiding responsible citizens. And, you know, one of the factors in footnote 9 is whether the law is narrow and objective. And I think that applies here. This law is narrow and objective. It's focused only on butterfly knives. It doesn't affect other knives. It doesn't affect other folding knives. It doesn't affect handguns. It's limited to a very specific definition of knife, and it's extremely narrow. It just applies to that kind of knife. And so I think, you know, all the fears that Mr. Beck and his client have don't apply here. You know, they cite a bunch of other knives that they're worried, you know, would be banned, but the other knives that they mention in their briefs, they aren't affected by this law. This law is very specific to butterfly knives, and it's because butterfly knives were associated with criminals and criminal activity. Your Honor, I again would like to mention that, you know, the laws that restrict weapons associated with criminals and criminal activity, again, they do stretch far back to the panic about bowing knives in the 1830s. They're throughout the United States, throughout the 19th century. A majority of states had these kinds of restrictions. And again, in Hawaii, these restrictions existed. Now, the butterfly knives, they're simply the latest form of this kind of problem. And, you know, they became a problem in the 1990s, and they are now part of this tradition, which is to restrict weapons that are popular among criminals and used for criminal activity. If you have no further questions, Your Honor, that's it. Thank you, Counselor. We'll hear rebuttals from Mr. Beck. I just have two very quick points I want to make. One is just a factual clarification. California does not ban butterfly knives. There's only two states that do. That's Hawaii and New Mexico. The Washington law is actually a little bit ambiguous. But in our footnote 9 of our supplemental brief, we have an appeals court that shows that it's not banned. So it's only two states, Hawaii and New Mexico. Other states impose significant restrictions? There's some restrictions, I mean, but in terms of a complete ban like we have here, it's just two. And the second issue I'd like to address is the legislative history. There's actually not any evidence that butterfly knives were used in crimes. What was happening in Hawaii, we don't actually think that would be sufficient, even if you could produce some evidence that some youth had used crimes, committed crimes with them. But the point is there wasn't actually any evidence of anyone committing crimes. What was happening is that delinquent high school students would be caught with them, not because they were engaged in some type of crime, just simply completely unassociated acts. And they just happened to have those on their person. That doesn't mean that because they had, say we said they had wallets on them and keychains. That doesn't mean that wallets and keychains are associated with crime. So they actually produced absolutely no evidence that butterfly knives were actually engaged, were used for a crime at all. What do you see as the basis that underlies the Supreme Court's comment that short-barreled shotguns were not covered, that they're exempted? Because that's the example it gives. It says that Reed Miller is not protecting those weapons not typically possessed by law-abiding citizens for unlawful purposes, such as short-barreled shotguns. What underlay that judgment? Well, I think it's important that this Court recognize that Heller did not overrule them. And so all the Supreme Court is saying there is they're reiterating Miller's holding. And what Miller actually said did not say that a short-barreled shotgun is not protected by the Second Amendment. What the Supreme Court said in 1934 is that it's not within the judicial notice that a short-barreled shotgun is protected by the Second Amendment. And what it did is remand the case back to the trial court in order to have an evidentiary hearing on the issue of whether a short-barreled shotgun is a militia arm. So I take the position that what Heller did is just simply reiterate the fact that there needs to be some evidence. And in Miller, there just simply wasn't evidence presented that the short-barreled shotgun is typically used for lawful purposes. So then there's an affirmative burden to present evidence to establish that it is used typically possessed by law-abiding citizens. And is that resolved as a question of fact? So I'm not completely – I believe what happened is that there's a presumption that – I mean, the Supreme Court has said there's a presumption that the Second Amendment applies prima facie to all barreled arms. The government can attempt to present evidence, and then, of course, I would have to present evidence that rebutts that. However, the initial burden is upon the government to rebut that presumption that applies to all bearable arms. And all that happened in Miller is that the government was able to present evidence. However, Frank Miller was not able – they didn't submit briefing, nor did they show up to court. So after the government had rebutted the presumption, they didn't do their job, Your Honor. What do you understand was the evidence that was present in Miller that established that the short-barreled shotguns were out? I don't recall. I mean, what – Because that seems the closest analogy. Yes, Your Honor. So figuring out what standards the Supreme Court applied to say that short-barreled shotguns are out would seem to be important to assessing this case. I'm not familiar with the Miller record beyond what I've already said, Your Honor. I mean, I know that I could address that if this court wanted to issue a supplemental order, Your Honor. Well, I'd like to follow up on a question that Judge Collins asked you. Do you see the plaintiff's burden in this case to show that butterfly knives are used primarily for self-defense? No, Your Honor. The burden is – and I take this from Heller – the burden is on the government to disprove that fact because the Second Amendment applies prima facie to all bearable arms. And I would direct this court – But it doesn't apply only to weapons that are typically used by a homeowner for self-defense? Yes, but the presumption is that they typically are. That any arm – howitzer is also used for self-defense? No, Your Honor. We know from Heller that the Second Amendment applies to all bearable arms. A howitzer is not a bearable arm. So once something is a bearable arm – and I direct this court to the New York rightful opinion at the Second Circuit that dealt with AR-15s. And as part of that opinion in New York, there was a rifle, a 410 shotgun – there was a long arm that was an issue, that was banned there, that the government wasn't able to present any evidence that this was not something that was typically used for lawful purposes. And the Second Circuit found that because the presumption applies to that arm, that they had to find that ban was unconstitutional. And while it's no longer of precedential value, I would direct this court to the now vacated opinion, the three-panel opinion in Duncan, which also said the same thing. Duncan? Yes, Your Honor. Are there any further questions, Your Honors? Okay, I want to cede the rest of my time. Thank you very much. Thank you, counsel. The case just argued will be submitted.
judges: BEA, COLLINS, LEE